STATE *ex rel.* THE CITY OF HUNTINGTON, *etc., Relator, v.* GEORGE R. HEFFLEY, *City Clerk, etc., Respondent*

(No. 9673)

Submitted November 21, 1944. Decided November 28, 1944.

256

*Geo. I. Neal* and *Maxwell W. Flesher,* for petitioner.
*Campbell & McNeer, L. E. Woods, Jr., Okey P. Keadle* and *Samuel Biern,* for respondents.

RILEY, JUDGE:

The City of Huntington, West Virginia, a municipal corporation, seeks in this mandamus proceeding to compel George R. Heffley, its city clerk, to countersign and attest bonds called "Flood Wall Revenue Refunding Bonds" in the aggregate principal amount of $1,209,000.00, pursuant to an ordinance adopted by the city council of said municipality on August 28, 1944, providing for the issuance of the refunding bonds and that flood walls theretofore constructed in the City of Huntington, under Chapter 68, Acts West Virginia Legislature, 1935, as three separate projects, be consolidated as a single project or undertaking.

Parties other than respondent Heffley, who has filed an answer, are John M. Lewis, Wykle Lewis, Pancake Realty Company, a corporation, Mary Martha Pancake, B. C. McGinnis, D. G. Gwinn, Allied Realty Company, a corporation, Third Eighth Realty Company, a corporation, The Lewis Furniture Company, a corporation, J. G. McNeer, and Walter H. Lewis, taxpayers and citizens of said city (hereinafter called "intervening taxpayers"), who petitioned to intervene as parties respondent and have filed an answer, and Harold J. Rice, owner and holder of Central Section Flood Wall Revenue Refunding Bond of said city, numbered 336, of the outstanding issue dated January 1, 1940, (hereinafter referred to as "intervening bondholder"), who filed an intervening petition on behalf of himself and "all of the owners or holders of the outstanding bonds" of said issue, praying that he be made a party respondent and that the writ sought be denied, but made no further appearance or filed any answer.

Submission of this proceeding is upon the pleadings and exhibits filed therewith, from which the following facts appear:

By Chapter 68, Acts of the Legislature, 1935, munici-

palities within this State were authorized to provide for flood control systems within their corporate limits and for ten miles outside, "except where such zone would overlap with another municipality, in which event the meridian line of the overlapping zone shall be the dividing line of their respective jurisdictions." Pursuant thereto, the city council of Huntington constructed three flood walls. The first, known as Central Section Flood Wall, was provided by ordinance adopted February 16, 1938, which likewise provided for payment thereof by the issuance of revenue bonds of the aggregate principal amount of $410,000.00, issuable in denominations of $1,000.00, bearing interest at the rate of four per centum per annum, and payable "only from revenues to be derived from charges imposed * * * upon the owners of property served and protected by said flood wall". The second, known as Western Section Flood Wall, was authorized by ordinance adopted December 11, 1939, and connects with the Central Section Flood Wall. The ordinance provided for the issuance of $600,000.00 in revenue bonds, bearing interest at the rate of 3½ per cent per annum, and likewise payable "only from revenue to be derived from charges imposed * * * upon the owners of property served and protected by said flood control system". The third wall, known variantly as Guyandotte Flood Wall or Eastern Section Flood Wall, was authorized by ordinance adopted April 2, 1941, to protect, according to the answer of the intervening taxpayers, "what was formerly the town of Guyandotte, and is separated from the remainder of the city of Huntington." This assertion of separation is corroborated by a map showing the locations of the walls, and the Guyan River (sometimes referred to in the record as Guyandotte River) physically separating the Central Section Flood Wall from the Guyandotte Flood Wall. For this last wall revenue bonds were authorized in the aggregate principal amount of $377,-000.00, bearing interest at the rate of 3½ per cent per annum, and payable "only from the revenues to be derived from charges imposed * * * upon the owners of property served by said flood system."

Concurrently with the adoption and passage of each of these ordinances, the council adopted a second ordinance fixing the rates to be charged against each of the parcels of real estate so served and protected. A copy of such ordinance affecting the real property within the area of the Central Section Flood Wall appears as an exhibit with the answer of the intervening taxpayers. Therein the terms "area to be protected" and "protected area" are defined as "that territory within the City of Huntington which said flood wall is designed to protect from inundation, damage or isolation by flood waters from the Guyan or Ohio River"; such property is divided into First Zone, Second Zone, and Third Zone, and the real estate placed into each of these zones is specifically designated. The First Zone comprises territory which was inundated or damaged "by both the flood of 1936 and the flood of 1937"; the Second Zone that territory so affected by the 1937 flood, but not included in the First Zone; and the Third Zone that territory not included in the First or Second Zones, but which would, except for the wall, be inundated or damaged if the Ohio River should reach a stage approximately three feet higher than the flood level of 1937.

The area served by the Western Section Flood Wall was divided into Fourth, Fifth and Sixth Zones. According to the answer of the intervening taxpayers, "The Fourth Zone included all real estate which was inundated by the 1936 flood; the Fifth Zone included all real estate which was inundated by the 1937 flood and which was not included in the Fourth Zone; and the Sixth Zone included all real estate within the protected area of the flood wall and not included in the Fourth Zone or the Fifth Zone."

The area served by the Guyandotte Flood Wall was divided into zones Seventh and Eighth. The real estate in the Seventh Zone was that inundated or damaged by the 1936 flood, while that in the Eighth Zone comprised "all real estate within the area protected by said flood wall, but not included in said Seventh Zone", a part of which is outside the corporate limits of the city.

The rates fixed by the respective rate ordinances, based

upon each $100.00 assessed valuation of the real estate within said areas, are as follows:

(1) *Central Section Flood Wall:*
First Zone _____ 14 Cents
Second Zone _____ 12 Cents
Third Zone _____ 8 Cents

(2) *Western Section Flood Wall:*
Fourth Zone _____ 26 Cents
Fifth Zone _____ 24 Cents
Sixth Zone _____ 18 Cents

(3) *Guyandotte Flood Wall:*
Seventh Zone _____ 50 Cents
Eighth Zone _____ 48 Cents

In each of the ordinances authorizing the issuance and payment of the revenue bonds, there is asserted, as a preface to the ordinance, that the property within the area to be protected will be specially benefited.

According to relator's petition, of the revenue bonds thus authorized and issued, there is now outstanding and unpaid the aggregate principal sum of $1,209,000.00. The city, seeking to consolidate the three issues of revenue bonds into one issue of refunding bonds, on August 28, 1944, by councilmanic action, adopted an ordinance wherein it declared the flood wall extending along the Ohio and Guyan Rivers to constitute a single project or undertaking, and provided for issuance and delivery of "Flood Wall Revenue Refunding Bonds" in the amount of $1,209,000.00. Of the amount sought to be refunded, $309,000.00 are of the Central Section issue, which apparently has been refunded at 3½% interest; $526,000.00 are of the Western Section issue, likewise apparently refunded at 2½% interest; and $374,000.00 are of the Guyandotte Wall issue. This ordinance recites that, "it is deemed for the best interests of said city, as well as the owners of property served and benefited by said flood wall, that said several sections thereof be combined and consolidated for operation, maintenance and financing purposes, as well as for imposing more equitable charges upon the property benefited,

served and benefited by said flood wall in its entirety." This ordinance, as well as the rate ordinance fixing the charges, was published in two newspapers, and relator avers that public hearings were held on September 11, 1944, at which time all interested persons were afforded an opportunity to be heard upon the matters contained in the ordinances but no objections were offered. Thereafter, on October 3, 1944, respondent Heffley, by written communication, advised council and the mayor of Huntington that "by reason of doubts of the legality of said ordinances", as city clerk, he refused to countersign and attest the bonds "unless and until a court of competent jurisdiction shall have issued its writ of mandamus so to do * * *". This refusal occasioned the councilmanic direction to the city attorney to institute the necessary proceedings to adjudicate the legality of the questions set forth in the city clerk's letter, which resulted in the present proceeding.

The plan of the municipality, as expressed in its two ordinances, is (1) to consolidate the three flood wall projects into a single undertaking so as to support the single consolidated schedule of charges and the single issue of Flood Wall Revenue Refunding Bonds, (2) to secure the payment of such bonds by charges to be annually assessed against all property within the limits of the city, and without said limits but within the flood walls, both real and personal, except intangible personal property. In the rate ordinance the real property (formerly included in the eight zones under the original ordinances authorizing construction of the three zones) is divided into Zones A, B, and C; and in addition Zone D is declared to embrace "all real property, including property owned by public service companies, located within the City of Huntington but not included within either of said Zones A, B, or C, together with all personal property, located within said City of Huntington, and also all property, both real and personal, as may be located outside the City of Huntington, but which is in the areas served and benefited by the flood wall * * *". Zones 1, 4 and 7 are placed into Zone A, with

a rate of 24 cents; Zones 2, 5 and 8 comprise Zone B, with a rate of 21 cents; and Zones 3 and 6, are placed into Zone C, with a rate of 15 cents. The rate for Zone D is 10 cents.

The intervening taxpayers deny the city's authority to consolidate the projects for the purpose of issuing a single issue of refunding bonds and to assess all real and personal property as proposed, and challenge the assertion that special benefits, as distinguished from benefits to the community at large, will be afforded and rendered by the flood wall in its entirety to all such property.

It is averred in the answer filed by the intervening taxpayers that one or more of them owns real estate in Zones 1, 2, and 3, as established under the ordinance authorizing the Central Section Flood Wall, as well as property in the elevated sections of the city within the Central Section, some of which is more than 100 feet above the top of that flood wall, and that they likewise own personal property, other than intangible personalty, in various locations in the Central Section which is situate in residence real estate more than 100 feet above the top of that flood wall. One of these intervenors likewise alleged that such realty and personalty received no benefit of any kind from the flood wall and cannot be benefited thereby. They also assert that the Guyandotte Flood Wall is completely separated from the rest of the City of Huntington by the Guyan River, and that said wall was not designed to protect and cannot possibly protect or benefit, either directly or indirectly, any realty or personalty located in the principal portions of the municipality.

Intervening bondholder Rice challenges the legality of the ordinance and alleges that such ordinances are "detrimental to and impair the security, source of payment, and obligation in favor of said Central Flood Wall Revenue Refunding Bonds to the loss and damage of" the intervening bondholder and the owners and holders of other bonds of said issue which are now outstanding.

The refinancing ordinance provided for notices of hearing by publication, which were duly given except that they were not subscribed with the name and title of any

official of the city. Chapter 68, Acts of the Legislature, 1935, the legislative authority under which the three flood walls were constructed, provided that before the ordinance shall become effective, it shall be preceded by two weeks' notice of a public hearing in a newspaper or newspapers published in the municipality, or where there is no such newspaper by posting in three public places. But Section 4, Chapter 120, Acts West Virginia Legislature, 1937, under which the refunding of the bonds is sought to be had, provides that, other than the adoption of a resolution authorizing the refunding bonds, "No other proceedings or procedure of any character whatever shall be required for the issuance of refunding bonds by the public body."

The ordinances under which the Eastern and Western Sections of the flood wall were constructed provided that the bonds issued under said ordinances may be called on certain dates set forth therein. The ordinance relating to the Central Wall contains no such provision, but the refunding ordinance protects the Central bondholders from any requirement that payment be accepted on their bonds.

We see no objection to a consideration of the intervening petitions and the answer of the intervening taxpayers. The intervenors are the real parties in interest. The respondent clerk has no interest in the outcome of this proceeding, except that of a citizen and public official. See *Hall* v. *County Court*, 100 W. Va. 11, 129 S. E. 712; *Rinehart & Dennis Co.* v. *McArthur*, 123 Va. 556, 96 S. E. 829; 35 Am. Jur., Mandamus, Section 339.

Chapter 120, Acts, West Virginia Legislature, 1937, authorizes municipalities to refinance "any enterprise" which, in turn, is defined therein as "any work, undertaking or project which the public body is * * * authorized to construct and from which the public body has heretofore derived or may hereafter derive revenues * * *." No specific language is found in the statute for consolidation of projects; but relator relies upon "the authority which vests in the governing body of the City, the City Council, discretionary powers which, unless it be shown have been arbitrarily and unreasonably exercised, cannot

be questioned and will not be disturbed by the courts." It requires no citation of precedents for the principle that the powers of municipalities are derivative rather than inherent, and the exercise of discretion which it may employ presupposes the existence of authority to perform such act. Where, as in the instant proceeding, the Legislature has endowed the municipality with power to refinance, the conduct of the city council must be measured by the language of the statute, which speaks only of refinancing of "enterprise" in the singular. While it is true Code, 2-2-10, permits the construction of a word importing the singular number as applying to several things, such a result is unwarranted in this case.

The consolidation provided for by the ordinances of 1944 contemplates an original assessment of property not embraced in the original projects, and what is virtually a reassessment of property included in the original taxing units. As in the case of the original assessment, the test of the validity of the reassessment is whether the public improvement creates a special benefit to the property assessed. 5 McQuillin, Municipal Corporations, 2d Ed., 2281.2; *Wagoner* v. *Lagrande,* 89 Ore. 192, 173 P. 308, error dismissed 249 U. S. 622, 62 L. Ed. 806, 39 Sup. Ct. 386. In the absence of a contrary showing, the assessments are presumed to be valid, and one who attacks their validity has the burden of establishing their invalidity. The same rule applies on the narrow question whether a public improvement creates a special benefit. But the rule seems to be otherwise where an improper basis or rule has been used in making the assessment. 5 McQuillin, Municipal Corporations, 2d Ed. 2269. Here we have variant costs of maintenance and construction; a difference in rates among the three original projects and, in the absence of a contrary showing, presumably a difference in the values of the properties embraced in the original units, an enlargement of the entire assessment area and a variously altered assessment of the properties embraced therein, notwithstanding one of the original areas is completely disconnected from the other two by the Guyan River. It would

indeed be a rare coincidence if the groups of properties comprising each of the three units would be equal in value, considering the irregular size and extent of the units, as shown by maps of the City of Huntington lodged by agreement of counsel with the Court. The establishment of different rates for each one hundred dollars of assessed property within the three units under the original ordinances is indicative that council regarded the values of the property as being different for the reason that the rates in the respective districts are not in the same ratio to the cost of construction, and it must be presumed that assessments for property tax purposes within the original areas are equal and uniform as required by West Virginia Constitution, Article X, Section 1. It would seem to follow necessarily that the ultimate cost to each group of property owners will, under the consolidation and the incident reassessment involved, be increased or decreased for the benefit and at the expense of property owners in the other units. The action of the city council in the enactment of the ordinances of 1944, though not tainted with fraud or wrongdoing, was arbitrary in character, and, in our opinion, renders the ordinances void. See generally the opinion in *Duling Bros.* v. *City of Huntington,* 120 W. Va. 85, 196 S. E. 552.

The ordinances of 1944 are void for further reasons. In *Duling Bros.* v. *the City of Huntington, supra,* this Court approved the plan of the City of Huntington to construct and maintain a flood control wall as authorized under Chapter 68, Acts of the Legislature, 1935, (Code, 8-4A), and to issue bonds for its share of the cost to be paid from special assessments over a number of years against real estate within the area served and protected by that flood wall. Therein it was held that:

"The area protected by a flood control system may be zoned in relation to the security afforded, and the assessment rates proportioned accordingly. Property not benefited should not be assessed. It is not requisite to the validity of an assessment, however, that the benefits be immedi-

ate or direct or that protection from floods be absolute. Municipal determination of the lands benefited, unless arbitrarily exercised, will not be disturbed by the courts." (Pt. 4, Syl.)

The pattern thus approved seems to have been used by the city in effecting construction of the Western Section Flood Wall and the Guyandotte Flood Wall. The procedure set forth in Chapter 68 requires the enactment of an "ordinance" or the adoption of a "resolution" relating to the construction of a flood wall and the issuance of bonds therefor, and authorizes the municipality by "ordinance or resolution" to establish and maintain just and equitable rates or charges for the use and services rendered by such wall, but before "such ordinance" authorizing the revenue bonds may become effective it shall be published once each week for two successive weeks in two newspapers of opposite political faith in such municipality, (where, as in the instant case, two such newspapers are published) and the "ordinance or resolution" fixing the rates or charges may not be finally enacted or passed until after a public hearing "at which all the users of the works and/or owners of the property served or to be served thereby, and others interested, shall have an opportunity to be heard concerning the proposed rates or charges." Notice of such hearing is required by publication similar to that of the "ordinance" authorizing the revenue bonds. Such was the procedure followed in the *Duling Bros.* case, and, presumably, in the construction of the other two flood walls. The rates so established are subject to revision in the same manner as such rates were originally promulgated under Section 17, Chapter 68, Acts of the Legislature, 1935, which likewise permits these charges to "be extended to cover any additional class of users or property thereafter served which fall within the same class." Relator cites this latter quoted portion of the statute to support its contention that personalty, exclusive of intangibles, may be assessed. Referring to 36 C. J., Subject, Levees and Flood Control, Section 58, cited in relator's brief, we find there is not unanimity of opinion as to the power of a municipality to tax personal

property for levee improvements. In the *Duling Bros.* case, *supra,* page 90, there is citation of authority for the proposition that such property is regarded as not benefited by a flood control system to the extent that it should be assessed therefor. See Cooley, Taxation, 4th Ed., Section 570. We approve the following reasoning used in *Snetzer* v. *Gregg,* 129 Ark. 542, 547, 196 S. W. 925, to deny the power to assess personal property:

> "* * * * * personal property can not be taxed, for the reason that it can not be specially benefited by a local improvement. The owner may be benefited in the enjoyment of the use of his personal property in that locality, but the property itself derives no benefit. A horse has the same value situated, for the time being, within the bounds of an improvement district, or outside of it. Money deposited in a bank, or commercial paper, is of the same value whether held in a city embraced in an improvement district or elsewhere, and a stock of merchandise is worth its market value wherever situated, regardless of a local improvement. The construction of the improvement may result in increased conveniences for handling the personal property, but the benefit, after all, is to the owner and not to the property. The *situs* of personal property follows the domicile of the owner. It may be located one day inside of an improvement district and the next day it is found elsewhere, and it has no fixed *situs* like real estate within the meaning necessary to constitute it the subject-matter of special assessments based on benefits."

What may be said of the relator's plan to enlarge the area of real property which it alleges to be benefited and served by the flood walls, and which the city proposes to assess? In the brief for the intervening taxpayers it is estimated that approximately thirty to forty per cent of the real estate which the city seeks now to assess is not within the areas protected by the walls from anticipated flooding and has not heretofore been subjected to assessment for the cost of the three projects. These respondents contend that such properties are not served or benefited

by the walls and therefore no assessment made against them is valid. The city admits that realty above the top of the flood wall would not suffer physically from actual inundation in case of a flood, but asserts that it would be protected "from a cessation of the use of public utilities and from interruption of business, traffic and other normal activities." It argues further that the flood walls were "designed to protect all of the City and its inhabitants from the hazards, damage, inconvenience, interruption of business, and danger to health which directly and indirectly result from floods." These contentions must be weighed in the light of Chapter 68, Acts, 1935, which provides that the costs incident to the construction of the flood walls may be "by means of tolls, fees, rents or charges other than taxation", and of the following definition of special benefits furnished by Judge Brannon in *Blair* v. *City of Charleston,* 43 W. Va. 62, pt. 5 syl., 26 S. E. 341, 35 L. R. A. 852, 64 A. S. R. 837:

> "What are special benefits? If property is enhanced in value by reason of a public improvement, as distinguished from the general benefits to the whole community at large, it is specially benefited, and is to be assessed for the special benefits, notwithstanding every other piece of property upon or near the improvement may, to greater or less extent, be likewise specially benefitted."

See also 2 Page and Jones, Taxation by Assessment, Section 654, wherein it is stated: "Assessments cannot be levied for general benefits. Within the meaning of this rule, general benefits are those which the owner receives in common with the community at large." These guides applied to properties above the top of the walls and between the walls and the Ohio River, impel the conclusion that such properties may not be assessed as properties specially benefited by the walls.

In the *Duling Bros.* case, pt. 4 syl., this Court recognized that it "is not requisite to the validity of an assessment * * * that the benefits be immediate or direct, or that the

protection from floods be absolute. * * *". That case does not stand for the proposition that general benefits such as are enjoyed by the community at large will ground an assessment. In that case a portion of the property assessed was surrounded by flood waters in 1937, while another portion so surrounded was within three feet of the height reached by that flood. Moreover, there was a finding by the city that such lands would be benefited, and there was an absence of showing that there was manifest and arbitrary abuse of power. In the instant case the ordinances contain no such finding that all the lands within the enlarged area would be specially benefited. If there had been, the finding, in our opinion, would clearly have been arbitrary.

As hereinbefore observed, the procedure provided by Chapter 68, Acts, 1935, requires notice and holding of a public hearing "at which all the users of the works and/or owners of the property served, or to be served thereby, and others interested, shall have an opportunity to be heard concerning the proposed rates or charges." If we may be guided by the 1944 ordinances, it is the rate ordinance which specifies those properties to be chargeable with the costs of the structure and maintenance thereof. An owner of real property in the vicinity of the flood wall would ascertain from that ordinance whether the city considered his property served by the particular public works, and unquestionably the efficacy of any protest from such an owner would depend upon his inclusion or exclusion from those sought to be assessed with the project's cost. Since the Legislature has provided the property owners with an opportunity of protest, it follows that such opportunity can be effective only if it is accorded prior to the time that the obligation, which an owner of property is required to discharge, becomes fixed. This opportunity is unavailing, where, as in the present proceeding, the city seeks for the first time and after the obligations have been initiated and the walls constructed, to bring in additional parcels of land to aid in the discharge of such obligations. This does not mean that where use of a public works is a tangible

matter and service thereof to a property owner. is unequivocal, the city is denied the right to extend the service or the right. to enlarge the class to be assessed with a use charge, nor does it mean that where through inadvertence or error a parcel within the area served has been omitted, the city is precluded from assessing such land (see 5 McQuillin, Municipal Corporations, 2d Ed., Section 2281.4; Section 17, Chapter 68, Acts, 1935.) ; but the circumstances are otherwise where the municipality at the inception of the undertaking, designates the properties within the boundaries of an area served and thereafter attempts to bring within the unit or units to be assessed property originally excluded therefrom, without any affirmative finding or showing that the current situation is different from that which existed when the original units were adopted, or that the property owners latterly sought to be assessed will be specially benefited under the consolidation. The enlargement of the assessed area was unjustified. It did not create any special benefit to properties sought to be assessed for the first time under the consolidation plan. In that regard, the assessments constitute taxation within the meaning of Article X, Sections 1 and 8, West Virginia Constitution. See *Casto* v. *Ripley*, 114 W. Va. 668, 173 S. E. 886.

The relator argues that the intervenors may not now be heard to attack the validity of the 1944 ordinances, since a public hearing thereon for the purpose of protest was held on September 11, 1944, and respondents at that time did not avail themselves of such opportunity. The revenue bond refinancing statute, Chapter 120, Acts, 1937, contains no requirement for notice. In fact, after providing for issuance of the refunding bonds by resolution, Section 4 of the statute reads, "No other proceedings or procedure of any kind shall be required for the issuance of refunding bonds by a public body". The statute does not provide for the establishment of rates with which to discharge the obligation of such bonds, and it necessarily follows that the provisions of Chapter 68, Acts, 1935, must be followed for. the establishment of rates and charges to provide funds

with which to pay the refunding bonds. The notice which the city gave included the ordinance of 1944, fixing such rates, but as the ordinance was invalid, it may not be said that such notice was binding on the present protestants. They are not estopped to assert their rights in this proceeding. It is a well-settled rule that a void assessment is subject to collateral attack at any time, and in any forum. *Heller & Co.* v. *Charleston-Dunbar Traction Co.*, 112 W. Va. 299, 308, 164 S. E. 853.

Our conclusions that the 1944 ordinances under appraisal herein are invalid and unenforceable, and that respondent taxpayers and bondholder are not estopped to challenge the validity of such ordinances, require the denial of the writ of mandamus to compel respondent Heffley, as city clerk, to countersign and attest the revenue refunding bonds since to do so would compel the performance of an illegal act. *Pardue* v. *County Court of Lincoln County*, 105 W. Va. 235, 141 S. E. 874.

*Writ denied.*